OPINION
{¶ 1} This case involves a struggle between a corporation that wants to build a "state-of-the art" gravel mining facility and adjoining landowners who fear destruction of their quiet residential neighborhood. The landowners prevailed both at the administrative level and in the trial court. As a result, the corporation, Shelly Materials, Inc. (Shelly) now appeals, asking us to overturn the decision denying a conditional use permit for the mining facility. After reviewing the record in detail, we find that although Shelly's plan has merit and may ultimately result in an attractive, reclaimed area of lakes and residential development, the proposed location is not a suitable choice. Accordingly, the trial court judgment will be affirmed.
 I {¶ 2} In the first assignment of error, Shelly claims that the trial court erred by purporting to use a correct standard of review without identifying any evidence in the record to support its decision. Shelly also criticizes the Clark County Board of Zoning Appeals (BZA) for failing to identify specific evidence justifying denial of the conditional use permit.
 {¶ 3} As has been pointed out many times, appellate courts have a restricted role in reviewing administrative appeals. Specifically, we must affirm the common pleas court, unless we find, "`as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence.'" Smith v.Granville Twp. Board of Trustees, 81 Ohio St.3d 608, 613, 1998-Ohio-340.
 {¶ 4} Among the questions of law that we may review is whether the common pleas court abused its discretion. See, e.g., Henley v. YoungstownBd. of Zoning Appeals, 90 Ohio St.3d 142, 148, 2000-Ohio-493. The role of the trial court is less limited, as it weighs the evidence and considers the "whole record" to see if "the administrative order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence." Id. at 147. In addressing Shelly's assignments of error, we will keep these standards of review in mind.
 {¶ 5} As we mentioned, this case arises from Shelly's attempt to obtain a conditional use permit for a sand and gravel mining facility in Moorefield Township, Clark County, Ohio. In March, 1998, Shelly purchased a 303.89 acre tract on County Line Road in Moorefield Township. The property was zoned agricultural A-1, which allowed sand and gravel extraction as a conditional use. Accordingly, Shelly filed an application in February, 1999, for a conditional use permit. At the time, Shelly was mining gravel next to the Clark County Fairgrounds. However, that site was nearing depletion and a new location was needed.
 {¶ 6} Eight residential subdivisions containing a total of 214 homes bordered the proposed gravel pit. As a result, Shelly held an open house to present its plan to the neighbors. After hearing concern about potential impact on roadways, groundwater quality, and noise, Shelly asked for the application to be tabled. Shelly then studied the issues and submitted an amended application modifying the facility's design.
 {¶ 7} Adjacent landowners were adamantly opposed to the gravel pit, and formed an organization called "Rally Against the Pit" (RAPA) for the purpose of contesting Shelly's application. RAPA appeared through its attorney at the BZA hearing, and was also given permission to intervene in the trial court, along with contiguous intervenors, Larry and Susan Taylor. RAPA and the Taylors (referred to collectively as RAPA) have also filed a brief in the present appeal, along with Appellee, Kelly Daniels, who is the Clark County Zoning Inspector.
 {¶ 8} During January, February, and March, 2001, the BZA held a series of hearings on Shelly's application. At the hearings, Shelly presented testimony from a groundwater consultant, a civil engineer who made a traffic impact study, an environmental engineer who performed noise analysis, an urban planner who prepared an impact analysis, a professional real estate appraiser, and an expert in planning and "performance zoning." RAPA countered with testimony from its own real estate appraiser and a professional planner. Various lay witnesses also testified in support of and in opposition to the plan. After hearing the testimony, the BZA voted to deny the permit at a meeting in April, 2001. At this meeting, the BZA outlined 15 requirements for the permit, and found, after some discussion, that Shelly's proposal failed to comply with four of the conditions.
 {¶ 9} After the vote, Shelly asked the BZA to file written statements of fact and law, so that further appeal could be taken. In response, the BZA issued conclusions of fact and a decision. The conclusions consisted of fifteen numbered statements tracking the language of specific requirements for resource and mineral extraction set out in Chapter 7, Section 129 of the Clark County Zoning Regulations. For example, paragraph 4 of Section 129 says that: "[t]he applicant must demonstrate that such operations will not be detrimental to the vicinity or surrounding properties." Similarly, paragraph 4 of the BZA decision says that: "[t]he Applicant has not complied with Section 129(4) of the Clark County Zoning Resolution, because the Applicant has not demonstrated that the proposed resource and mineral extraction use would not be detrimental to the vicinity or surrounding properties."
 {¶ 10} All 15 findings were phrased the same way. Shelly then filed an appeal with the common pleas court, but did not submit additional evidence. Instead, the matter was submitted on written briefs. Subsequently, the trial judge filed a decision that was slightly over two pages long. In the decision, the judge outlined the applicable standard of review. He also commented briefly on the BZA's duty to give due regard to how consistent the proposed use was with the nature and condition of adjacent structures. And finally, the judge made these remarks:
 {¶ 11} "Shelly proposed to operate a gravel pit on over 300 acres in Moorefield Township. Shelly's gravel pit would be located in an area where over 250 residential homes are located. There is a preponderance of substantial, reliable and probative evidence in the record upon which the Board of Zoning [sic] could reasonably conclude that:
 {¶ 12} "1. the Shelly gravel pit would be detrimental to the vicinity and surrounding properties [Chapter 7, Section 129(4)];
 {¶ 13} "2. the Shelly gravel pit would not be operated in such a manner as to eliminate as far as practical, noise, vibration, or dust which would injure or annoy persons living in the vicinity [Chapter 7, Section 129(5)];
 {¶ 14} "3. the Shelly gravel pit would not be carried out in a manner and on such a scale as to minimize dust, noise, and vibrations and to prevent adversely affecting the surrounding properties [Chapter 7, Section 129(12)]; and
 {¶ 15} "4. the access roads to the Shelly gravel pit would not be maintained in a dust-free condition [Chapter 7, Section 129(13)]."
 {¶ 16} After making these observations, the trial judge commented that the BZA decision was not against the manifest weight of the evidence and that the decision was supported by a preponderance of reliable, probative, and substantial evidence. Accordingly, the judge affirmed denial of the conditional use permit.
 {¶ 17} In contesting the decision, Shelly argues that the evidence before the BZA consisted of both competent and incompetent evidence. Based on this fact, Shelly feels the BZA's failure to specify the evidence on which it relied created an insurmountable obstacle for the trial court. This error was then compounded by the trial court's own failure to analyze the evidence.
 {¶ 18} In response, all Appellees claim that Shelly waived any challenge to the BZA findings by not raising the issue below. They point out that Shelly's proper remedy would have been to file an affidavit seeking to introduce additional evidence in the trial court. See R.C.2506.03(A).
 {¶ 19} Under R.C. 2506.03(A)(5), if an administrative body fails to file conclusions of fact supporting its decision, an appellant may file an affidavit asking the common pleas court to admit additional evidence. If such new evidence is presented, the trial court acts as a fact-finder concerning the new evidence and then reviews the entire record to see if the administrative decision was supported by a preponderance of substantial, reliable, and probative evidence. In reAnnexation of Certain Territory (1992), 82 Ohio App.3d 377, 383.
 {¶ 20} We do not think this procedure applies, since the BZA did issue conclusions of fact. Notably, Shelly does not contend that the BZA failed to file conclusions; instead, Shelly says the conclusions were flawed because the BZA did not discuss specific evidence. Consequently, Shelly would not have been entitled to present additional evidence at the common pleas level. We also feel nothing would have been gained by adding evidence. The administrative record was quite voluminous and contained expert testimony, several written reports, and supporting documents and photos. Thus, the trial court had a more than adequate record to review.
 {¶ 21} As a final point in this regard, we note that Shelly did raise the alleged deficiency of the BZA findings with the trial court. Specifically, Shelly said in its trial court brief that the BZA failed to either cite evidence from the record or provide analysis regarding the four zoning requirements that were not satisfied. As a result, Shelly did not waive the ability to challenge the BZA findings.
 {¶ 22} Turning to the findings themselves, we agree that they were somewhat sparse. Nonetheless, although the BZA did not detail the evidence supporting its findings, logic indicates that the BZA accepted RAPA's expert opinions and rejected the testimony of Shelly's experts, or at least rejected testimony that did not support its findings. This logic is consistent with the established principle that courts are "bound by the nature of administrative proceedings to presume that the decision of the administrative agency is reasonable and valid." Community ConcernedCitizens, Inc. v. Union Twp. Bd. of Zoning Appeals, 66 Ohio St.3d 452,456, 1993-Ohio-115. The flaw, however, according to Shelly, is that both incompetent and competent evidence was presented to the BZA. Therefore, Shelly believes that the lack of specific factual findings hindered the trial court, and prevents this court, as well, from appropriately analyzing the BZA decision. In this regard, Shelly cites authority that criticizes administrative bodies for making conclusory findings. In contrast, RAPA relies on cases exempting administrative bodies from the duty to issue findings of fact and conclusions of law.
 {¶ 23} As a preliminary matter, we must disagree with RAPA's view that no factual findings were required. If this were the case, R.C. 2506.03
would not allow supplementation of the record when administrative bodies fail to file conclusions of fact supporting their decisions. Obviously, parties should be informed of the reasons for decisions, and courts should have something to review. In fact, some courts have held that "due process requires administrative agencies to apply their decisions with findings of fact and legal conclusions." Arnett v. Ohio State RacingComm. (Apr. 19, 1984), Franklin App. No. 83AP-721, 1984 WL 5710, *8, citing A. Dicillo Sons, Inc. v. Chester Zoning Board of Appeals
(C.P. 1950), 59 Ohio Law Abs. 513.
 {¶ 24} Dicillo Sons is one of the cases Shelly has cited to support its position. RAPA contends that A. Dicillo Sons is inapplicable and that we should instead apply Paul v. Bd. of ZoningAppeals, Cty. of Findlay (Sept.1, 1989), Hancock App. No. 5-87-25, 1989 WL 106212. In Paul, the Third District Court of Appeals held that a municipal zoning board of appeals has no duty to make findings of fact and conclusions of law. The basis for the decision was that R.C. 713.11
(which authorized municipal boards of zoning appeals) did not impose a duty to make findings. The Third District also did not find any other statutory authority that prescribed such a requirement.
 {¶ 25} While discussing this point, the Third District distinguished A. Dicillo Sons because it had relied on a statute that ultimately became part of the Administrative Procedure Act (APA). Id. at 1989 WL 106212, *2, referring to G.C. 154-70. The Third District reasoned that since municipal zoning boards of appeals were not administrative agencies as defined by the APA, the APA's requirement of factual findings did not control the actions of a municipal zoning board. Id.
 {¶ 26} As we noted earlier, R.C. 2506.03(A)(5) requires factual findings to be filed. Since township boards of zoning appeals are clearly subject to this statute, we could distinguish Paul on this basis. However, municipal zoning boards are also subject to R.C. Chap. 2506 — a fact that Paul does not discuss. See, e.g., Cahill v. Board ofZoning Appeals of City of Dayton (1986), 30 Ohio App.3d 236, 238 (Chap. 2506 appeal involving grant of conditional use permit) and K Mart Corp.v. City of Westlake, City Council (Feb. 13, 1997), Cuyahoga App. No. 69953, 1997 WL 64046, *1 (Chap. 2506 appeal of denial of application for use of real property). We also think Paul is incorrect, as A. Dicillo Sons specifically said that the APA did not govern the appeal because township boards of zoning appeals were not made subject to the APA's provisions. 59 Ohio Law. Abs. at 517. Instead, A. Dicillo Sons relied on general principles of law pertaining to administrative agencies. Id. at 518. Nonetheless, we need not resolve this issue, since the BZA did make findings of fact. Shelly's claim, as we mentioned earlier, is that the findings were conclusory and were based on incompetent evidence.
 {¶ 27} In Cahill, we noted that the failure of the zoning board of appeals to make specific findings of fact "undoubtedly added to the responsibility and difficulty encountered by the common pleas court during the review process." 30 Ohio App.3d at 238. However, we also found the evidence sufficient to overcome the void. Id.
 {¶ 28} In the present case, Shelly's argument rests on a claim that RAPA's expert testimony is incompetent. If we find this evidence incompetent, then we must also conclude that the BZA's decision is not supported by substantial, reliable, and probative evidence. However, after reviewing the evidence, we feel that the expert testimony was adequately reliable.
 {¶ 29} In support of its position, Shelly cites Chesapeake O. Ry. Co. v. Public Utilities Commission (1955), 163 Ohio St. 252, paragraph two of the syllabus, in which the Ohio Supreme Court said that:
 {¶ 30} "[w]here a record of a hearing before the Public Utilities Commission contains competent evidence along with incompetent evidence, and it is impossible to determine to what extent the order of the commission is based on the competent evidence, this court will not attempt to determine whether such order is based upon sufficient evidence unless the findings of the commission reveal that they are based on evidence received under established and recognized rules for the production of evidence."
 {¶ 31} Unlike the present case, the evidence in Chesapeake
consisted primarily of hearsay information. In contrast, RAPA presented testimony from both a real estate appraiser and an urban planner. While fault might be found with some testimony of these experts (as with some testimony of Shelly's experts), they were properly qualified and the weight to be given their opinions was for the BZA and trial court to decide. Jenkins v. Gallipolis (1998), 128 Ohio App.3d 376, 384 (noting that the court of appeals does not weigh the evidence in administrative appeals).
 {¶ 32} In analyzing this issue, we have disregarded the majority of testimony from RAPA's lay witnesses, many of whom inserted unfounded and improper "expert" opinions into their presentation. For example, one neighbor of the proposed pit speculated that gravel might cause enteroliths (or sand colic) to form in the intestines of horses she was breeding. This witness was not a veterinarian and her "opinion" was based primarily on things she had been "told." Therefore, her testimony was of little value. Similarly, other neighbors expressed concern over potential groundwater contamination, based on hearsay information. They, too, did not have the scientific expertise to form appropriate opinions. We are aware that relaxed rules of evidence apply in administrative proceedings. Simon v. Lake Geauga Printing Co. (1982), 69 Ohio St.2d 41,44. Nonetheless, this does not mean the testimony of lay witnesses should be accepted as expert opinion, where no basis has been established. SeeHaley v. Ohio State Dental Bd. (1982), 7 Ohio App.3d 1, 6 (holding that while administrative agencies are not bound by strict rules of evidence, they "should not act upon evidence which is not admissible, competent, or probative of the facts which it is to determine").
 {¶ 33} As has been stressed in many cases, "[t]he fact that adjudicatory hearings are to be open to the public does not result in their transformation into legislative public hearings with the corresponding right to receive input of public comment at that time. The ploy of swearing in the members of the public does not alter the fact that the bulk of these witnesses are merely offering their subjective and speculative comments and unsubstantiated opinions." Adelman Real EstateCo. v. Gabanic (1996),109 Ohio App.3d 689, 694, citing In re Rocky PointPlaza Corp. (1993), 86 Ohio App.3d 486.
 {¶ 34} The testimony of RAPA's real estate appraiser will be discussed in more detail below, as it is intertwined with the two remaining assignments of error. For now, we simply conclude that this evidence was not wholly incompetent and that the trial court had an adequate record upon which to make a decision.
 {¶ 35} We also note that the trial court did not have to make separate findings of fact and conclusions of law, because no additional facts were presented on appeal. See, e.g., Roseman v. Village ofReminderville (1984), 14 Ohio App.3d 124, 129. Again, the trial court's decision was certainly not detailed, and could have been more helpful. However, the court's duty was only to decide if the BZA decision was supported by the appropriate evidence. The court did comply with this duty, although minimally.
 {¶ 36} Accordingly, in light of the above discussion, the first assignment of error is overruled.
 II {¶ 37} In the second assignment of error, Shelly contends that the trial court decision is not supported by a preponderance of reliable, substantial, and probative evidence.
 {¶ 38} As we said earlier, the BZA found that Shelly's application did not comply with four conditions. Shelly addresses each finding separately, and points out the lack of evidence supporting the BZA's conclusions. The first finding Shelly discusses is an alleged failure to comply with Chapter 7, Section 129(5), which requires that all equipment used in a gravel mining operation "be constructed, maintained, and operated in such a manner as to eliminate so far as practical, noise, vibration, or dust which would injure or annoy persons living in the vicinity."
 {¶ 39} At the final hearing, one BZA member observed that Shelly could not control whether dust existed. Another member expressed concern about whether dust could be removed from homes once it attached. And finally, the other concern was over potential health problems that dust might cause.
 {¶ 40} The issue, therefore, is whether the trial court abused its discretion in concluding that a preponderance of substantial, reliable, and probative evidence supported the finding that the pit would not be operated in a way to eliminate dust "so far as practical." This wording does not establish an absolute standard; rather, it implies reasonable attempts to eliminate dust.
 {¶ 41} "Whether there is any evidence to support a decision is a question of law. * * * A determination that there is a complete lack of evidence to support a finding does not involve a weighing of the evidence. * * * A decision without any foundation in fact is unreasonable, and, therefore, a complete lack of evidence as to the stated basis for its decision would support a finding that the board's decision was not supported by the required quantum of evidence." GeneralMotors Corp. v. Joe O'Brien Chevrolet, Inc. (1997), 118 Ohio App.3d 470,483 (citations omitted).
 {¶ 42} The evidence before the BZA indicated that the gravel pit would be a wet operation. In this kind of operation, gravel is taken from the ground and is introduced into the plant over conveyors. The gravel goes through a crushing operation, and then into a washing and sizing operation. Water can be introduced at the crusher if necessary. A wheel washer would also be available to wash the wheels of trucks while they are loading. No blasting would be required for removing materials. Instead materials would be dug out.
 {¶ 43} As designed, the gravel pit would have a one-mile access road leading from the plant to St. Route 4. Equipment would be on site to keep the road damp and pressure-washed. The site itself is very large, i.e., it is a half-mile by a mile wide. The processing plant would be placed in the central northern part of the site to maximize distance between residences and the processing plant. 15 feet high landscaped berms were also to be constructed around the perimeter of the entire property, and the elevation grade of the plant and processing area would be lowered 20 feet below ground level.
 {¶ 44} There was no testimony indicating that this type of design would fail to eliminate dust as far as practical. There was also no testimony indicating that dust problems would occur. One witness speculated, as we said, about the possibility of sand and gravel causing sand colic in horses, and described an enterolith that had been removed from a horse raised near a gravel pit. Even if this testimony had been more than speculation, there is no indication that the particular gravel pit had a design like Shelly's proposed operation. Therefore, there was a complete lack of evidence to support the BZA and trial court findings that Shelly failed to comply with Section 129(5).
 {¶ 45} Another condition that was allegedly not satisfied was Chapter 7, Section 129(12), which says that "[a]ll quarrying, blasting, drilling, or mining shall be carried out in a manner and on such a scale as to minimize dust, noise, and vibrations and to prevent adversely affecting the surrounding properties." The BZA's basic concern in this regard was again mostly with dust. One member commented that he had never seen a gravel pit that did not have dust and noise. The BZA also expressed concern over certain weather conditions like wind that could not be controlled. And finally, one member commented about a dust problem mentioned in testimony from a neighbor of the existing Shelly gravel pit.
 {¶ 46} Again, there was no testimony indicating that dust problems would result from an operation similar in design that is recessed into the ground and has a berm surrounding the entire perimeter of the property. The only testimony about dust came from Allan Hess, the director of the Clark County Fairgrounds, who spoke in favor of the proposed pit. Hess testified that Shelly had been an excellent neighbor and had done what it said it would. He also said Shelly had taken care of dust problems and clean-up problems as they happened. The implication of this testimony is that some dust problems had occurred. However, from the evidence submitted, the existing Shelly operation was completely unlike the proposed gravel pit. Specifically, the existing operation is at ground level, and has large piles of gravel or sand sitting in the open, with no barriers at all. Accordingly, the fact that the existing operation had some dust problems (which were promptly resolved), does not provide any evidence that the design in question would cause any dust problems. We also note that a property owner near the proposed site testified that gravel pits could emit fine particulate matter that has been associated with health problems. Again, this testimony was not from an expert, or from anyone who appeared remotely qualified to express a medical or scientific opinion. Furthermore, there was no testimony correlating any such effects with a gravel pit similar to the design proposed for the Shelly facility.
 {¶ 47} Moreover, to the extent that the BZA mentioned noise, the unrebutted evidence was that the design, as proposed, would not alter existing noise levels in the neighborhood. In this regard, an environmental engineer performed a noise impact study and concluded that project-related noise levels would be less or equal to ambient noise levels currently existing in the neighborhood. No evidence was submitted disputing or contradicting this study. Some neighbors expressed concern over what they thought the noise level would be, but no evidence was presented indicating that the noise levels from the proposed operation would exceed appropriate standards.
 {¶ 48} In view of the above discussion, the record shows a complete lack of evidence to support the BZA and trial court conclusions that Shelly's proposal failed to comply with Section 129(12).
 {¶ 49} A third condition is that "[a]ccess roads shall be maintained in dust-free condition by surfacing or other treatment as may be specified by the Clark County Engineer." Chapter 7, Section 129(13). Regarding this point, the BZA felt that while Shelly said various methods would be used to minimize dust, the regulation specified a "dust-free" access road. However, one BZA member did note that she had not "seen too many dust-free roads anywhere."
 {¶ 50} Shelly contends that this regulation is incapable of being satisfied by any type of access road. Consequently, insistence on absolute compliance is a ruse to allow the BZA to reject applications. We agree that if a regulation establishes a standard that is impossible for anyone to meet, it cannot be upheld. Compare Morris v. Shelly and Sands,Inc. (June 18, 1993), Ross App. No. 1846, 1993 WL 221089, *6 (affirming trial court's refusal to instruct jury that existence of ridge in road violated an Ohio Department of Transportation Construction and Materials regulation requiring contractors to keep highways under construction "free of all holes, ruts, ridges, bumps, and dust." Specifically, the Ross County Court of Appeals reasoned that if the regulation were interpreted literally, no one could ever comply, since "[t]o some degree, every highway has holes, ruts, ridges, bumps, and dust.")
 {¶ 51} An established rule of construction for statutes and ordinances is that "[w]ords in common use will be construed in their ordinary acceptation and significance, and with the meaning commonly attributed to them." Eastman v. State (1936), 131 Ohio St. 1, 2, paragraph five of the syllabus. Accordingly, we interpret Section 129(13) to require dust on access roads to be minimized as much as reasonably possible. This is consistent with the regulation on dust in Section 129(12) that was previously discussed. And, for the reasons already mentioned, we find no evidence to support the BZA and trial court findings on this point. Specifically, the unrebutted testimony indicated that Shelly planned significant measures to minimize or eliminate dust, including wheel-washers for trucks, a mile long asphalt-type access road, and equipment to keep the road damp and pressure-washed. There was no testimony suggesting that these measures would be ineffective in keeping dust at a level consistent with other roadways in the area. Accordingly, the trial court and BZA findings with regard to Section 129(13) were without any foundation in the evidence.
 {¶ 52} The final condition is that "[t]he applicant must demonstrate that such operations will not be detrimental to the vicinity or surrounding properties." Chapter 7, Section 129(4). After briefly assessing this issue, the BZA members found that Shelly failed to prove that it would not hurt surrounding properties. The primary potential adverse effects of Shelly's proposed use, as addressed in the record, were noise, dust, groundwater contamination, traffic, and real estate devaluation. We have already discussed noise and dust, and have found no evidence to support the BZA findings. Likewise, the record does not support a finding that groundwater contamination would occur. In this regard, Shelly submitted testimony and a report from geologist, Herb Eagon, who performed a hydrogeologic investigation. Without discussing the findings in great detail, we note that Eagon concluded that the proposed operation would not affect groundwater levels, flow, or quality. Fuel storage would be minimal and double-walled containment would be used to safe-guard against spillage. Eagon also noted that pollution potential from a sand and gravel operation was less than the risk from application of agricultural chemicals and was less than light sewage from residential development. And finally, Eagon said no known groundwater contamination problems had occurred as a result of the 500 existing sand and gravel operations in Ohio.
 {¶ 53} Again, opposing this testimony were comments from adjoining landowners who expressed fear about potential problems, but no proper scientific evidence. By this comment, we are not suggesting that only experts can testify. However, if evidence on technical subjects is to be of any help to agencies and courts, it should rest on some demonstrably accurate foundation. Compare Dingledine Basic Materials, Inc. v. ButlerCty. Bd. of Zoning Appeals (Mar. 29, 1999), Butler App. No. CA98-08-171, 1999 WL 172770, *12 (finding substantial, reliable, and probative evidence to support denial of conditional use permit, based in part, on testimony of professor at cooperative extension service about potential well contamination problems). See also, In re Elizabeth Twp. Bd. ofZoning Appeals (Sept. 28, 1994), Miami App. No. 93 CA 62, 1994 WL 527579, *2 (indicating that while hearsay evidence may be admitted during administrative proceedings, one of several factors to be considered is whether the hearsay that is admitted carries indicia of reliability).
 {¶ 54} RAPA did submit a letter from an individual who had drilled wells in Clark County. This individual expressed concern over potential well contamination from industrial oils, diesel fuel leaks, and the like that would be a necessary part of operations. However, the unrebutted testimony from Shelly was as related above, i.e, that no groundwater contamination had ever been documented from gravel operations and that containment procedures would be used. Again, speculation about possibilities is not evidence.
 {¶ 55} As with groundwater concerns, potential traffic impact was based on speculation. When the project was initially proposed, the Clark County Engineer expressed concern about whether local roads could absorb the impact of the added traffic. To meet this concern, Shelly developed a plan in which a mile-long private ingress and egress access road would lead directly from the gravel pit to St. Rt.4. Trucks coming to the plant and leaving would not travel on local roads surrounding the gravel pit; instead, the access road would tunnel beneath an intersecting road (Mumper Rd.) and lead out to St. Rt. 4. The unrebutted evidence was that Shelly, itself, would purchase 70-75% of the gravel and transport it to its own asphalt plant on St. Rt. 41. The balance of the material would be sold to Clark County, the State of Ohio, townships, the City of Springfield, and some major concrete producers in the area. According to Shelly, about 90% of the trucks would, therefore, exit to county or city facilities south of the gravel pit. According to Shelly's traffic engineer, the total traffic being added to St. Rt. 4 per day was about 320 cars and trucks, which was acceptable. This would include 22 trucks in and 18 out per hour during morning peak hours, and 18 trucks in and 22 trucks out per hour during the afternoon peak. The plant itself was scheduled to be open 12 hours per day, between 7 a.m. and 7 p.m.
 {¶ 56} After learning of the revised plan, the County Engineer indicated that the new route addressed the traffic concerns in a very fundamental way. However, the Moorefield Township Trustees still opposed the plan because they felt the new entrance would not prevent truck drivers coming from the north and west from using rural roads to reach St. Rt. 4. In other words, once truck drivers exited onto Rt. 4, they might then take a rural road that offered a more direct route to their ultimate destinations. The trustees also said they did not have resources to maintain and replace roads carrying the type of weight involved, nor did the township have resources to post and enforce load-limits signs. Similarly, the local board of education opposed the plan due to concern over the safety of school buses and children on roads that would also be carrying gravel trucks.
 {¶ 57} Whether or not trucks carrying gravel would choose to turn off St. Rt. 4 onto other rural roads after leaving Shelly's access road is a matter of speculation. Both the trustees and school board felt that this would be the case, as a matter of "common sense." However, even if we assume that some percentage of trucks would use alternate routes after entering St. Rt. 4, two questions remain. First, what would be the effect of the number of trucks which reasonably might travel on other roads? If we assume that 90% of trucks would travel on St. Rt. 4, as the unrebutted evidence suggests, then about 1.8 trucks per hour would leave Shelly's facility during morning peak travel and possibly leave St. Rt.4 for a rural road. Would this amount of traffic cause significant wear and tear on township roads? No evidence indicates that this would be the case.
 {¶ 58} By way of contrast, in Dingledine, the development service manger of the county engineer's office testified about the condition and construction of rural roads surrounding a proposed gravel pit. 1999 WL 172770. No such testimony was presented here, other than a letter from the township trustees, which said that the trustees were not in a position to maintain roads "suffering rapid demise from the relentless pounding that would take place with tri-axial mammoths carrying tons of load over roads never designed for such traffic." While this comment is certainly descriptive, it is also devoid of facts.
 {¶ 59} The second question involves the extent to which Shelly should be charged with decisions truck drivers make when they are miles away from the plant. Reasonable minds would say that neither Shelly nor any other commercial or industrial operation should be held responsible for such matters, particularly where the company in question has done everything possible to restrict access. Pertinent to this point is the fact that the local school board opposed the permit because Shelly could not "guarantee" that no additional gravel trucks would travel back roads. This is an unrealistic and impossible standard for any operation to meet. We understand that local authorities are, and should be concerned about maintenance and safety. However in the absence of evidence that is something more than pure speculation, agencies and courts cannot make reasoned decisions.
 {¶ 60} The final and most difficult issue is whether real estate values would be affected if the conditional use permit were allowed. In arguing that denial of the permit was proper, Appellees rely heavily on the idea that gravel pits are an industrial use and are inherently incompatible with residential uses. Because of this incompatibility, property values will allegedly decrease and will cause a detrimental effect on the surrounding area.
 {¶ 61} As an initial point, we note that "[I]nclusion of conditional use provisions * * * in zoning legislation is based upon a legislative recognition that although certain uses are not necessarily inconsistent with the zoning objectives of a district, their nature is such that their compatibility in any particular area depends upon surrounding circumstances." Gerzeny v. Richfield Twp. (1980),62 Ohio St.2d 339, 341. In Gerzeny, the court did not confine compatibility to surrounding "uses." Instead, the court used the term surrounding "circumstances." Therefore, to conclude that a permit should be denied because a gravel pit is generally incompatible with residential uses begs the question. Specifically, if general incompatibility were the only issue, gravel mining could never be allowed.
 {¶ 62} To the contrary, however, the Clark County Zoning Regulations allow mineral extraction, including gravel mining, as a permitted conditional use for the district in which Shelly's property is located. Since such a use is allowed, the pertinent question is whether the use is compatible in light of all surrounding circumstances. These circumstances include matters we have previously discussed, like noise impacts, groundwater contamination, and so forth. Of these circumstances, impact on surrounding property values would simply be one factor.
 {¶ 63} The evidence about impact on property values was disputed. Ordinarily, such a conflict in evidence would provide an adequate basis for affirming the BZA and trial court decisions. However, Shelly says this would be error because the RAPA evidence on property values was highly suspect and unreliable.
 {¶ 64} At the hearing, RAPA presented testimony from Ronald Stickelman, a real estate appraiser. According to Shelly, Stickelman's analysis was so flawed as to have no evidentiary value. The first flaw that Shelly discusses is Stickelman's methodology, i.e., his use of "paired sales" analysis, which pairs comparable properties in order to value a point of difference. For example, to decide if the presence of a gravel pit would affect value, a property in the neighborhood of a pit is compared to a similar property without such an influence.
 {¶ 65} For purposes of this analysis, Stickelman chose two gravel pit locations or potential locations in Greene County, Ohio. The first was a proposed gravel pit approved by Spring Valley Township in November, 2000. At the time of the Shelly hearing, the Spring Valley case was being appealed through the court system. In February, 2002, we affirmed the grant of a conditional use permit for the gravel pit. See ConcernedCitizens of Spring Valley v. Spring Valley Twp. Bd. of Zoning Appeals, Greene App. No. 01 CA 0059, 2002-Ohio-540, 2002 WL 191575.
 {¶ 66} In his report, Stickelman indicated that the Spring Valley permit was for a mining pit similar to the one Shelly proposed. Because no contradictory evidence was offered, we will assume that the two proposed operations are, in fact, similar. Stickelman compared the sale price of a property across the street from the Spring Valley site with sales of two similar properties that were not near the site. Based on these statistics, Stickelman found that the negative influence of the gravel pit caused a loss in value to the subject property of 16.4% to 20.8%.
 {¶ 67} The other gravel pit Stickelman studied was an existing facility located in Sugarcreek Township. In this situation, Stickelman compared a sale of property located next to the gravel pit with another property about 1.5 miles away. This time, he found that the negative influence of the pit caused a loss in value of about 25%.
 {¶ 68} At the hearings and on appeal, Shelly has spent much time attacking the validity of the Sugarcreek analysis. After reviewing the record, we must agree with Shelly. Based on the record, the only conclusion we can draw is that no similarity exists between the Sugarcreek site and the proposed Shelly facility. Consequently, no legitimate conclusions can be drawn about the effect of Shelly's proposed gravel pit on property values. To be specific, the property Stickelman used for Sugarcreek is located in an industrial district and is directly next to what could only be called an eyesore. Further, the Sugarcreek facility includes both a gravel pit and asphalt factory and has none of the enhancements proposed by Shelly to buffer or hide the impact of the Moorefield Township operation. And finally, the property Stickelman chose as comparable is so dissimilar as to preclude any meaningful analysis.
 {¶ 69} If we eliminate that evidence, what is left is the Spring Valley comparable, which neither side has analyzed in great detail. At the hearing, Shelly's expert did say that the Spring Valley study should be excluded because the properties chosen for comparison were not, in fact, similar. An additional criticism was the small number of properties (only two) used for comparison. Spring Valley also has a further flaw in that no facility existed at the time of the study. Instead, only the prospect of a facility existed. Therefore, the fact that property values may have decreased in anticipation of a gravel pit is only as relevant as any decrease that may have taken place in housing values in the affected part of Moorefield Township. The issue, as we see it, is the weight to be given to property values that are not caused by an actual condition, but are the result of people's fear and anxiety over events that may never occur.
 {¶ 70} In our opinion, far more persuasive evidence comes from situations that actually exist, i.e, how property values have been affected by facilities that are similar to the proposed operation. Notably, Shelly did present such evidence at the hearing. First, Shelly submitted photos of existing residential developments that abut operating gravel pits (Crystal Lake development in Carmel, Indiana, and Marblecliff Quarry in Franklin County, near Columbus, Ohio). These pictures show attractive single-family and multi-unit housing with quarry equipment and operating plants clearly visible in the background. According to Shelly, the residences at Crystal Lake are being developed on lots that cost $140,000 and more, with houses valued in excess $380,000.
 {¶ 71} Thomas Willingham, a professional real estate appraiser, performed an impact study for Shelly, using areas surrounding four existing quarries: Union County, Ohio; Fairfield, Ohio; Ross, Ohio; and Louisville, Kentucky. Data from sales in areas within and outside the quarry influence indicated that land values around a quarry appreciated at a similar or even greater rate than properties not within the influence. As a result, Willingham found that aggregate mining operations do not negatively impact residential property values and do not eliminate or diminish development activity. Shelly also submitted a 1996 study done by two economics professors from Ohio Wesleyan University, who concluded that quarry operations do not have a significant impact on property values.
 {¶ 72} After Willingham testified, RAPA hired an appraisal company in Indiana to take aerial pictures of the Carmel facility. Although no report from the appraisal company was submitted, RAPA's real estate expert (Stickelman) testified that the homes Shelly pictured were two and a half miles away from the operation and were on lakes, not gravel pits. Therefore, Stickelman discounted the results of the Carmel study. Stickelman also criticized the Fairfield, Ohio study because a waste treatment plant was located in the vicinity. However, if anything, that would be even more reason for values to possibly decline. Nonetheless, the Fairfield data indicated an overall appreciation rate that was approximately the same as the rate for properties not within the influence of a quarry.
 {¶ 73} Stickelman additionally outlined flaws in data supporting the Union County, Ohio study. After correcting the data, Stickelman arrived at a figure of 2.43% yearly appreciation for property inside the influence versus a 6.28% appreciation rate for property outside the influence. And finally, Stickelman dismissed both the Louisville, Kentucky, and Ross County, Ohio, statistics. He disregarded Louisville simply because it was outside the State of Ohio, and rejected Ross County because Willingham had not disclosed underlying data.
 {¶ 74} Significantly, Stickelman did not cast any real doubt on either the Louisville or Fairfield figures, both of which indicate that the presence of a mining operation does not cause a decline in property values. Stickelman's testimony also did not explain the pictures of the Carmel housing, which clearly show mining equipment near residential property. Furthermore, his testimony did not address Marblecliff, which shows many expensive houses that have clear views of an operating mining facility.
 {¶ 75} Following Stickelman's testimony, Shelly submitted expert testimony from three witnesses, who criticized Stickelman's methodology and conclusions. Among these witnesses was Willingham, who additionally defended his own study. RAPA then continued the expert witness "slugfest" by presenting Stickelman's "answer" to the rebuttal report.
 {¶ 76} Besides the above testimony, conflicting evidence was presented concerning whether property values had declined because of the potential gravel pit. Shelly offered evidence of favorable sales occurring since Shelly's purchase of the property, and RAPA offered evidence of sales at below market rates. As we said, this evidence is only relevant if speculation and fear are legitimate considerations.
 {¶ 77} Since the BZA concluded that the proposed operation would have a detrimental effect, we must assume that the BZA found Stickelman's testimony persuasive. Although Stickelman's own study is of no consequence due to its flaws, he did present testimony that would have allowed the BZA to conclude, with respect to one of Willingham's studies (Union County) that the presence of a quarry could cause property values to decline. Does this one study provide substantial, reliable, and probative evidence supporting the BZA's decision? We think, in conjunction with other evidence, that it must.
 {¶ 78} In contrast to the dust, noise, groundwater, and traffic impact findings of the BZA and trial court, we cannot find a complete lack of evidence to support the decision that real estate values would be adversely affected by the gravel pit. General Motors Corp.,118 Ohio App.3d 470, 483. Specifically, although we may have reached a different decision on the submitted facts, we are not allowed to weigh the evidence.
 {¶ 79} The testimony of Stickelman, while largely discredited and irrelevant, does indicate that property values may be adversely impacted by a gravel pit. Moreover, even though we have reservations about the extent to which fear and speculation, rather than reality, should dictate decisions, the fact is that we have previously allowed adjoining property owners to offer opinions about the value of their property, despite the fact that they are not qualified as experts. Oberer Development Co. v.City of Fairborn (Apr. 23, 1999), Greene App. No. 98-CA-96, 1999 WL 235843, *13-14. In Oberer, we cited testimony from various condominium owners about the diminution in value allegedly caused by proposed construction of a commercial project. We then said that "the condominium owners may not have been the best `experts' or witnesses on an anticipated decrease in their property value, but they did have knowledge on that subject and their opinions were entitled to be given weight. After hearing all the testimony, Council could have reasonably decided to believe either side, and did not act unreasonably in giving weight to the owners' opinions about diminution in value." Id. at 14.
 {¶ 80} In this regard, the BZA in the present case heard testimony from two property owners who lived in the area of the proposed gravel pit. Both owners purchased their homes after Shelly first applied for approval of the gravel pit, but neither knew of the application at the time of the purchase. In one case, the price was definitely below market price for comparable houses; in the other, the price was well below the appraised value. In both cases, the owner was not told about the proposed gravel pit, and testified that he would not have purchased the home had he known. Another witness testified that he originally wanted to build another home in the area, but people were not willing to buy his home due to its proximity to the proposed pit. Moreover, he no longer wanted to build another home because the new lot was also close to the pit. This witness further indicated that 29 people who lived in the area of the pit were willing to sell their homes, even though they had lived there for many years.
 {¶ 81} As an additional matter, Stickelman indicated that average market time for homes in this part of the township was 40% higher than before the pit was proposed. Another property owner, a home builder, said that he had purchased 55 acres for a 23 home residential development, with riding trails, horse arenas, and stables. However, the lending institution that had helped him buy the property was now reluctant to lend money for the project.
 {¶ 82} As we said, we question how much effect should be given to a decline in property values driven by fear. Evidence of what happens after a facility like the one at issue is built would be far more persuasive. However, since the evidence we have outlined is more factual than the unsubstantiated "concerns" about dust, noise, groundwater contamination, and traffic, we cannot find that the trial court abused its discretion. Specifically, the record contains direct evidence that Shelly failed to establish that the proposed operation "will not be detrimental to the vicinity or surrounding properties."
 {¶ 83} Furthermore, even if all the conditional use permit conditions were satisfied, approval would not have been automatic. SeeCommunity Concerned Citizens, 66 Ohio St.3d 452, 456. See also Oberer, 1999 WL 235843, *7. Specifically, the BZA was still required to "give due regard to the nature and condition of all adjacent uses and structures and the consistency therewith of the proposed Conditional Use and any potential nuisances." Clark County Zoning Regulations, Chapter 7, Section (A)(5). In this regard, Appellees contend that gravel mining is inconsistent with the surrounding rural residential area. In particular, Appellees point to the fact that the purpose of the A-1 agricultural district is to preserve farm land and preclude incompatible commercial development.
 {¶ 84} Again, however, we must return to the point that gravel mining is a permitted conditional use in the A-1 district. By its very nature, gravel mining is incompatible with agricultural preservation, since it involves excavating and permanently removing soil. Therefore, something more is required. Nonetheless, while the evidence is far from overwhelming, we have to conclude, based on our prior discussion, that the trial court did not err in finding the proposed gravel pit incompatible with the surrounding area.
 {¶ 85} Accordingly, in light of the preceding discussion, the second assignment of error is overruled.
 III {¶ 86} In the third assignment of error, Shelly alleges that the trial court erred in failing to find the BZA's decision unconstitutional, illegal, arbitrary, capricious, and unreasonable. Shelly raises three points in this regard. The first is that the BZA abused its discretion by interpreting the zoning regulations in an unreasonable and arbitrary manner. In particular, Shelly focuses on Sections 129(13) and 129(4) of the zoning code. According to Shelly, Section 129(13) bears no reasonable relationship to public health, safety, or welfare because it requires an absolutely dust-free road. We have previously discussed this issue. If we felt the regulation actually required a dust-free road, we would agree with Shelly. However, we interpreted Section 129(13) to require reasonable attempts, and the proposal complied with the regulation as interpreted. As a result, we do not need to further address this point.
 {¶ 87} Additionally, Shelly criticizes Section 129(4) on grounds that it imposes a subjective standard that is impossible to review. Specifically, Shelly feels the phrase "detrimental to the surrounding area" is purely subjective.
 {¶ 88} In the context of zoning regulations, an individual's right "to use and enjoy his private property is not unbridled but is subject to the legitimate exercise of the local police power. * * * This power includes the authority to impose zoning regulations, although such regulations must conform to certain standards. Since the object of the police power is the public health, safety and general welfare, its exercise in order to be valid must bear a substantial relationship to that object and must not be unreasonable or arbitrary." Village of Hudsonv. Albrecht, Inc. (1984), 9 Ohio St.3d 69, 72. See also, CincinnatiBell, Inc. v. Village of Glendale (1975), 42 Ohio St.2d 368, 370. InAlbrecht, the court stressed that legislation cannot design rules to fit every circumstance, and that administrative bodies may be given discretion. However, for legislation to be valid, it must "set forth sufficient criteria to guide the administrative body in the exercise of its discretion." 9 Ohio St.3d at 74.
 {¶ 89} After reviewing this matter, we find that the standards in Section 129(4) have sufficient criteria to prevent arbitrary enforcement. Although the regulation is broad, we had no difficulty ascertaining how the proposed facility might be detrimental to surrounding properties. Indeed, the entire proceeding before the BZA was focused on whether the gravel pit would adversely affect the area.
 {¶ 90} Notably, the Ohio Supreme Court had no apparent problem inCommunity Concerned Citizens with a requirement that a zoning board give "due regard to the nature and condition of all adjacent uses and structures." 66 Ohio St.3d at 452. This language is broad, too, but a zoning board's traditional rule is to decide these types of issues. Certainly, a board cannot make arbitrary decisions. On the other hand, the board must have discretion to perform its job.
 {¶ 91} As a final point in this context, we note that Shelly has raised the issue of other conditional use permits for sand and gravel extraction that were granted around the time Shelly's application was denied. However, Shelly did not file an affidavit with the trial court, asking to submit this evidence, and we may not consider it, since it was not part of the original record. R.C. 2605.03.
 {¶ 92} Shelly's second argument in support of the third assignment of error is that the BZA abused its discretion by failing to give the application "due regard" as required by Chapter 7, Section (A)(5) of the Zoning Regulations. In this regard, Shelly claims that once a zoning resolution creates conditional uses, the use is presumed to be in the public interest. Therefore, for denial to be justified, the record must indicate that no set of conditions can be imposed to integrate the project into the surrounding area. To illustrate how these principles were violated in the present case, Shelly cites various "concerns" of BZA members for which conditions were not imposed. These concerns were then used unfairly, according to Shelly, to deny the permit.
 {¶ 93} Previously, in discussing whether the BZA's decision was supported by appropriate evidence, we rejected the theory that a conditional use permit should be automatically denied when a proposed use is inherently incompatible with residential uses. Based on the same reasoning, we also reject the idea that zoning boards have a duty to affirmatively impose any and all conditions that might possibly integrate a proposed project. If this were the case, zoning boards would be stripped of their discretionary ability. The Clark County Zoning Regulations recognize this discretionary power, by stating that "[i]n the event the Board approves the Conditional Use, it may impose such reasonable conditions as it deems necessary to insure that the use will be conducted in the best interest of the Zoning District." Chapter 7, Section (A)(6). Use of words like "in the event" clearly implies discretion. Compare Essroc Materials, Inc. v. Poland Twp. Bd. of ZoningAppeals (1997), 117 Ohio App.3d 456, 462 (involving regulations stating that the board "may" issue a conditional use certificate. Thus, issuance of the certificate is discretionary).
 {¶ 94} As we also mentioned previously, conditional use permits are not automatically granted, even if all conditions have been satisfied. Community Concerned Citizens, 66 Ohio St.3d 452, 456. The concept we think Shelly is trying to advance was discussed in Gillespiev. Stow (1989), 65 Ohio App.3d 601. In Gillespie, the planning commission approved a proposed conditional use and recommended that city council approve the application, but the council refused. Id. at 604. Ultimately, the Ninth District Court of Appeals ordered the permit issued with such conditions as were consistent with the zoning code. The Ninth District acknowledged that conditional permits are not automatic. Id. at 606. However, the court also found that under the regulation in question, council only had the power to review the application. More important, council could not deny the conditional zoning certificate simply because it no longer desired the permitted use in the particular location. Id. at 607. In this vein, the court noted that:
 {¶ 95} "[t]he test for determining whether the action of a legislative body is legislative or administrative is whether the action is one enacting a law, ordinance or regulation already in existence. * * * If council is permitted to deny a proposed use which is consistent with the existing C-2 zoning, council, in effect, is rezoning the property without legislative action." Id.
 {¶ 96} This is the same type of argument Shelly makes in the present case. Whether the argument is classified as a mandate for automatic approval once specific conditions are met, or is couched in terms of the BZA being required to impose any and all conditions that would allow integration of the proposed use, the practical effect is the same — the BZA's discretion would be eliminated.
 {¶ 97} Our first observation is that Gillespie is not pertinent, because the body denying the application in that case was, in fact, a legislative body, rather than a zoning board. In addition, the regulations were different and supported the Ninth District's conclusions. Furthermore, the Ohio Supreme Court subsequently decidedCommunity Concerned Citizens, which involved the same type of zoning regulations as the present case. Specifically, the zoning code inCommunity Concerned Citizens required applicants to satisfy certain conditions for conditional use permits. The application in question was for a daycare, but the permit was denied. 66 Ohio St.3d 452, 455. The applicant claimed that because it could satisfy all the conditions for a conditional use permit, the zoning board's failure to approve the use was a legislative act and an improper exercise of power. Id. However, the Ohio Supreme Court disagreed, stating that:
 {¶ 98} "[i]t is undisputed that appellant's day care center would conform to each of the specific conditional use requirements. However, appellant fails to recognize that Section 304 of the same township zoning resolution required * * * [the board] to consider additional information prior to deciding whether to grant a conditional use. Section 304 * * * provides * * * The Board shall have the power to hear and decide * * * applications filed * * * for conditional uses * * *. In considering an application for a conditional use, the Board shall give due regard to the nature and condition of all adjacent structures." Id.
 {¶ 99} Accordingly, the Ohio Supreme Court concluded that "[w]hether appellant could meet the specific requirements * * * [for a conditional use permit] was but one factor to be considered by appellee in making its decision. Proving compliance * * * [with the specific requirements] did not in any way make the grant of a conditional use `automatic.'" Id. at 455-56.
 {¶ 100} Similarly, the BZA in the present case was required by to "give due regard to the nature and condition of all adjacent uses and structures and the consistency therewith of the proposed Conditional Use and any potential nuisances." Clark County Zoning Regulations, Chapter 7, Section (A)(5).
 {¶ 101} Shelly has not cited an Ohio case imposing a presumption that a conditional use is in the best interest of the general welfare. Instead, Shelly relies on a federal case, Cellular Telephone v. ZoningBd. of Adjustments (C.A.3 1999), 197 F.3d 64, which involved an application by three cellular communication providers for a variance. Id. at 66. Shelly admits this case is not controlling, but suggests that a four-part test from Cellular Telephone appropriately describes the BZA's duty to give "due regard" to the nature and condition of all adjacent uses.
 {¶ 102} According to Cellular Telephone, the four part test was adopted to give local boards of zoning a procedure for balancing "positive and negative criteria." Id. at 74. Positive and negative criteria are relevant because boards may not grant variances absent a showing that the variance "`can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'" Id. Under the test:
 {¶ 103} "First, the board should identify the public interest at stake and determine, in the general scheme of public importance, whether or not it is compelling. Second, the board should identify the detrimental effects of granting the variance and determine whether they are only minimal or more severe. Third, the board should reduce any detrimental effects, if possible, by imposing reasonable conditions on the proposed use. Finally, the board should weight the positive against the negative criteria and determine whether, on balance, granting the variance would be a substantial detriment to the public good." Id. at 74-75.
 {¶ 104} According to Shelly, the third step represents the "due regard" process the BZA allegedly failed to perform. Again, this simply follows the argument that the BZA was obligated to grant the conditional use upon application. This is not how we read the regulations. We also do not find the four-part test pertinent, because it relates to specific obligations New Jersey statutes impose on zoning boards when they consider variances. If Ohio statues had similar language, then the test might be relevant.
 {¶ 105} Shelly's final argument in support of the third assignment of error is that the denial of the permit was arbitrary, capricious, and unreasonable because it had no real or substantial relationship to the public health, safety, morals, or general welfare. The crux of this argument is that Shelly's property is unique because it contains an abundant amount of sand and gravel. Shelly contends that Clark County has a current shortage of gravel, and that a need exists, now or in the future, for this material to be removed for the public benefit. According to Shelly, denying extraction of this valuable resource is poor land use planning. Furthermore, allowing the area to be used for residential purposes will cause the gravel and sand to be permanently inaccessible. In contrast to these facts, Shelly maintains that the only reason the application was denied is because the neighbors do not want a gravel operation in their backyard.
 {¶ 106} In support of its position, Shelly cites several cases that discuss the unique nature of mineral rights. For example, in Villageof Terrace Park v. Errett (C.A. 6 1926), 12 F.2d 240, a village passed an ordinance designating land to be used for gravel excavation as residential. The district court enjoined the village from enforcing the ordinance against the owner of the gravel operations, and the Sixth Circuit Court of Appeals affirmed. During its discussion, the Sixth Circuit noted that a substantial difference exists "between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage, and an ordinance that wholly deprives the owner of land of its valuable mineral content." Id at 243. Consequently, the Sixth Circuit held that if the ordinance were enforced as written, it would cause a taking of private property without compensation. Id.
 {¶ 107} A similar philosophy was expressed in Silva v. Township ofAda (1982), 416 Mich. 153, 330 N.E.2d 663. In that case, the Michigan Supreme Court reaffirmed the rule that "zoning regulations which prevent the extraction of natural resources are invalid unless `very serious consequences' will result from the proposed operation." 330 N.E.2d at 664.
 {¶ 108} As a preliminary point, we note that the present case does not involve zoning regulations that prohibit extraction of natural resources. In contrast, Silva involved requests for rezoning or reclassification of areas that were not zoned for mineral extraction. Id. at 665. Similarly, in Errett, no zoning existed at the time a landowner began preparing to mine gravel. However, the village council then passed an ordinance which designated the land as a residential district and precluded its use for mining. 12 F.2d at 240.
 {¶ 109} Where land has been zoned to preclude a particular use, Ohio follows the rule that "[t]he power of a municipality to establish zones and to classify property accordingly, is purely a legislative function which will not be interfered with by the courts, unless such power is exercised in an arbitrary, confiscatory and unreasonable manner in violation of constitutional guarantees." Balsly v. Clennin (1964),3 Ohio App.2d 1, 4. Therefore, a landowner's right to use property is not absolute, even where the prohibited use may be more profitable. For example, in Balsly, the court noted that the land would be far more profitable if used for gravel mining. However, the court also held that zoning legislation prohibiting mining did not amount to an unlawful taking because it bore a substantial relationship to the community's health and welfare. Id. at 3.
 {¶ 110} Unlike the zoning codes in the above cases, the Clark County Zoning Regulations did not automatically deprive Shelly of any possibility of using its land for sand and gravel extraction. Instead, mining was a permitted use, so long as it complied with requirements in the zoning code. Furthermore, Shelly did not allege an unlawful taking of its property, nor did Shelly establish that its land was unique. Contrary to Shelly's comments in its brief, the testimony did not reveal a current shortage of sand and gravel in Clark County. Instead, the testimony indicated only that Shelly's existing facility in Clark County was nearing depletion. The fact that Shelly's own site was being depleted does not mean that a shortage existed in the county.
 {¶ 111} Moreover, while the proposed site had about 100 feet of sand and gravel and was one of the best natural resource areas for sand and gravel in the county, this does not mean that other locations, more suitable for mining, were unavailable. Accordingly, Shelly's final argument is without merit. As we said earlier, we may have made a different choice than the BZA or trial court. However, that does not make their decisions either arbitrary or unreasonable.
 {¶ 112} In view of the above discussion, the third assignment of error is overruled.
 {¶ 113} Since all three assignments of error have been overruled, the judgment of the trial court is affirmed.
WOLFF, J., concurs.